## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VINCENZO BADALAMENTI ,

    *Plaintiff*,

*v.*                      CASE NO. 13-14108

CAROLYN W. COLVIN        DISTRICT JUDGE SEAN F. COX
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Vincenzo Badalamenti was forty-five years old at the administrative hearing. (Transcript, Doc. 10 at 48, 149.) He worked as a foreman in a painting company for twenty years before he allegedly became disabled on March 11, 2009. (Tr. at 149-50, 165.) Plaintiff's application for DIB, filed on August 25, 2010, was denied at the initial administrative stage after the Commissioner considered Plaintiff's claims of organic mental disorders (organic brain syndrome) and "[i]schemic heart disease with or without angina." (Tr. at 82.) Administrative Law Judge ("ALJ") Gregory Holiday convened the administrative hearing on September 12, 2011. (Tr. at 48-81.) After considering the application *de novo*, the ALJ decided on October 4, 2011 that Plaintiff was not disabled. (Tr. at 32-43.)

On May 23, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied review. (Tr. at 5-8.) Plaintiff obtained an extension for seeking judicial review, (Tr. at 1), and on September 26, 2013, filed the instant suit. (Doc. 1.)

**B.     Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once

2

this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*

3

*v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from

its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.   Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable
> physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the

Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the onset date and that he met the insured status requirements through March 11, 2009. (Tr. at 34.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "traumatic brain injury; coronary artery disease; hypertension; cervical spine disorder; obesity; and anxiety." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 35-37.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform work a limited range of sedentary positions. (Tr. at 37-41.) *See* 20 C.F.R. §§ 404.1567(b), 416.967(b). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 37-41.) At step five, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 42-43.)

### E.    Administrative Record

### 1.    Medical Records

The earliest medical records, beginning in June 2008, indicate low back pain. (Tr. at 284.) On March 12, 2009, Plaintiff walked into the emergency room after he hit his head in an automobile accident the prior evening. (Tr. at 224.) Immediately after the accident, he felt stunned and confused, but could walk; later a headache grew worse, he developed "some lightheadedness" when standing up, and appeared "a bit slow to respond," according to his friend. (*Id.*) He was

dizzy, he said, but the intake screener found him alert, oriented, and cooperative. (*Id.*) His neck pain was mild, and he had forearm injuries, but denied any other back or chest pain, or problems walking. (*Id.*) During the examination, Plaintiff's neck had normal range of motion and was normal by most other measures, though it was tender. (Tr. at 225-27.) His forearm was also tender but his arms were normal. (*Id.*) The neurological examination seemed normal as well; his gait, speech, and memory were unremarkable. (*Id.*) However, his eyes had horizontal nystagmus, which is an abnormal and involuntary movement of the eyes from side to side. 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* F-174 (2013). His eyes did not hurt, however, and appeared normal. (*Id.*) His back was normal, without tenderness, and his legs were also unexceptional. (Tr. at 225-27.) His mental orientation was adequate, and he had normal affect, insight, and concentration. (*Id.*) Diagnostic testing was likewise normal and Plaintiff did not have any signs indicating his headache had a "serious etiology." (Tr. at 225-27, 231-32.) Additionally, after the examination, the forearm pain had resolved. (*Id.*) The physician noted that there was an "extremely low risk" of anything serious developing, and discharged him with a diagnosis of "[h]ead injury with concussion." (*Id.*)

Diagnostic imaging results from later in March 2009 revealed that Plaintiff's cervical spine had only minor "endplate and disc changes . . . ." (Tr. at 315.) An MRI showed no significant disc bulging, herniation, or never root compression, and only a few levels had mild narrowing. (Tr. at 317.) A brain MRI likewise came back normal, "without evidence of cerebral contusion or extra-axial hemorrhage." (Tr. at 316.)

Plaintiff saw Dr. Ben Go in March 2009. (Tr. at 275, 279-80.) He complained of forgetfulness, neck pain, and irritability. (*Id.*) Later in March, he remained unchanged and added

8

that he did not take any medications. (Tr. at 278.) On physical emanation, however, his head, neck, musculoskeletal system, and neurological system were normal. (Tr. 275, 279-80.) From April through May, his neck and head were normal on the physical examination, but his neck pain continued. (Tr. at 273, 276.) The notes from May and June appointments were the same. (Tr. at 274, 276.) He continued to complain of neck pain, noise sensitivity, and forgetfulness. (*Id.*)

On June and July 2009, Dr. Richard Gelb, Ph.D., examined Plaintiff on Dr. Go's referral "to determine whether or not he has cognitive/emotional residuals of a closed head injury" related to his accident. (Tr. at 235-46.) Plaintiff stated he did not lose consciousness after the accident, but did "see stars" and was "dazed right after the impact." (Tr. at 235.) "Other than being dazed and having a cut on [his] forehead . . . he [was] not aware of any symptoms/problems at the scene of the accident" and he did not then go to the hospital. (*Id.*) Within a day, however, his head "did not seem righ[t]," feeling as though "a hard hat or a bowl" sat atop his head. (*Id.*) That feeling persisted, as had a pounding headache–usually from level seven to ten out of ten on a visual analog ("VA") scale–and noise sensitivity. (*Id.*) As an example of the noise issues, he said he could usually manage attending hockey games but at the last one "a guy yelling in his arena bothered him." (*Id.*) The neck pain also persisted. (*Id.*) New issues had since developed: he struggled to sleep, felt sluggish when waking, and had memory difficulties. (*Id.*) Speech problems had also occurred, such as unintentionally speaking backwards, though this had "gotten better a little." (Tr. at 236.) He took Tylenol, which did not help, and had recently discontinued an anti-depressant when it began giving him heartburn after a dosage increase. (*Id.*) Despite the problems, he said "the only reason he went to the hospital was [because] it was at the same time as the actress who had a head injury in a ski accident and ended up dying from it." (*Id.*)

Plaintiff also told Dr. Gelb that since finishing high school he had worked as an industrial and commercial painter. (*Id.*) He was currently employed; however, the last time he worked was in November 2008, when he was terminated. (*Id.*) His employer called him back in March 2009 but Plaintiff "told his employer of his situation and has not done any work of any kind since" the accident. (*Id.*) His headaches, dizziness, and memory problems prevented him from returning, he claimed. (Tr. at 240.) He enjoyed the work and "got along fine with his boss and with customers." (Tr. at 236.) He only occasionally drank alcohol, but did smoke. (Tr. at 236-37.) He had a good relationship with his wife and together they had three children. (Tr. at 237.) He had stopped playing soccer after the accident but still bowled. (*Id.*) Personal care was not difficult and he could also help around the house, watering the plants and sweeping, though never cleaning the windows because after the accident climbing ladders had made him dizzy. (*Id.*) He sometimes lost his balance walking and became disoriented. (*Id.*) Though more cautious since the accident, he could drive. (*Id.*) He had close friends and talked to neighbors. (*Id.*) During a typical day he sat on the porch, watered plants, talked to neighbors, went to his friend's house, napped, and watched television. (Tr. at 237-38.)

Plaintiff told Dr. Gelb that about a month after the accident he became depressed and, in the weeks leading up to his consultation, he felt it daily. (Tr. at 237.) He had never seen a mental health expert before, he stated, and had not taken any psychotropic drugs except an antidepressant, which he stopped using. (*Id.*) He did not suffer panic attacks or experience hallucinations. (*Id.*) He had nightmares since the accident and also had grown irritable. (*Id.*)

Dr. Gelb also interviewed Plaintiff's wife for the report. (Tr. at 239.) She confirmed his forgetfulness, irritability, and disequilibrium. (*Id.*) His headaches were constant and growing

10

worse; loud noises still bothered him. (*Id.*) She had stopped requesting he do chores because it aggravated his headache. (*Id.*) The issues had also impeded his decision-making, forcing him to take longer to come to decisions and rely on her for guidance. (*Id.*) He could become confused and frustrated. (*Id.*) He stopped writing checks because he was nervous he would make a mistake. (Tr. at 240.) He had become "self-absorbed," failing to express much interest in others. (*Id.*)

During the appointments, Dr. Gelb observed that Plaintiff's vision and hearing were "functional," he ambulated without difficulty, and his speech was clear. (*Id.*) Plaintiff requested they break up the testing over two days, and asked for a break during the second session. (*Id.*) After the first appointment, his wife called, concerned about Plaintiff's disorientation and lethargy. (*Id.*) The testing found that Plaintiff's intelligence was in the borderline range and there was "no evidence . . . [of] a decline in his overall intellectual functioning." (*Id.*) His "general fund of information task" score was at the "low[-]average range," he had significant deficits in reading and spelling, and was below average in arithmetic. (*Id.*) He scored in the "mild to moderate deficit range" on arithmetic tasks requiring concentration. (Tr. at 241.) He was average or low-average in most other concentration tests. (*Id.*) Memory tests were also in the average to low-average range, along with a few borderline and mild deficit scores. (*Id.*) Language tests indicated moderate deficits. (*Id.*) His perceptual-motor skills registered in the average to low-average range, with a few lower scores. (Tr. at 242.) "Executive" functioning test scores varied; many were average but a few were borderline or showed mild to moderate deficits. (*Id.*) On Plaintiff's emotional status testing, the results suggested exaggerated complaints and Dr. Gelb cautioned against relying on Plaintiff's "markedly elevated scores" in this portion of the examination. (Tr. at 243.)

Finally, amidst the tests were three designed to see how much effort he put into the rest. (Tr. at 242-43.) One score was "above the recommended cutoff," he failed a second, and the third score was indeterminate. (Tr. at 243.) His effort "appeared to vary, from less than sufficient effort at times to adequate/good effort at other times. Thus, the reliability of any test score that is below average is difficult to interpret in terms of its accuracy." (Tr. at 244.)

Dr. Gelb concluded that Plaintiff probably experienced a concussion during the accident. (Tr. at 245.) He could not discern the accident's impact on Plaintiff's cognitive functioning, in part because of Plaintiff's flagging effort. (*Id.*) Dr. Gelb believed that Plaintiff's time off work left him with an "excessive amount of time" to ruminate on his problems. (*Id.*) No cognitive deficits would prevent him from returning to his painting job. (*Id.*) He assessed somatoform pain disorder, meaning that Plaintiff's complaints of pain had no pathological or physiological explanation. (*Id.*) *See* 5 J.E. Schmidt, *supra* at S-205. Also, Plaintiff had an unspecified learning disorder even before his accident. (Tr. at 245.) Dr. Gelb recommended that Plaintiff "focus on what he is still able to do" rather than dwell on "what he perceives he cannot" do. (*Id.*) Also, his doctors could consider referring him to a psychiatrist or "[t]ime limited cognitive behavioral therapy for pain management" if his problems continued. (Tr. at 246.) Increasing his activity level was critical to his mental health, and Dr. Gelb advised against "lying down for more than very short periods of time" unless medically necessary. (*Id.*)

In June 2009, Plaintiff began physical therapy, planning on attending a few times each week for around a month. (Tr. at 248.) In August, the therapist noted that Plaintiff's neck seemed stiff and he had rounded shoulders. (Tr. at 249.) His cervical spine remained tender and the notes suggest he had cervical hypermobility. (Tr. at 250.) During the examination, he appeared alert,

cooperative, oriented, and consistently able to follow two-step instructions. (Tr. at 251.) By the fourth visit, Plaintiff reported feeling "slightly better." (Tr. at 252.) Later, he said the pain was intermittent, at level four or five out of ten on a VA scale. (Tr. at 253.) His "spinal stabilizers strength" had improved, his range of motion remained limited, looking "up" caused pain," reaching overhead increased the pain, and he could drive without pain, but still not return to work. (*Id.*) At the end of August, the therapist estimated Plaintiff was fifty-percent towards meeting his short-term goals. (*Id.*) In September, Plaintiff said he felt no pain after the sessions, but the "carry over to [the] next day [was] poor." (Tr. at 255.) Further, his cervical range of motion was now "good." (*Id.*) Around that time, his pain had inched downward to level three or four out of ten. (Tr. at 256.) Overhead reaching was still difficult. (*Id.*) He had no new complaints or surprising results in September. (Tr. at 258-59.) He was discharged in October, having met eighty-percent of his goals. (Tr. at 260.) His pain, mostly in his lower cervical area, was intermittent, generally at level three out of ten. (*Id.*) The frequency and intensity of his headaches were decreasing, though overhead reaching remained difficult and his spinal stabilizing muscles were weak. (*Id.*) He could drive and complete household chores, such as laundry and light cleaning. (*Id.*)

Plaintiff saw Dr. Go again at the end of 2009. (Tr. at 269-71.) His complaints remained steady but the physical examination results were unchanged. (*Id.*) He told Dr. Go he became dizzy climbing ladders. (Tr. at 269.) The examination results were "unchanged" in February 2010. (Tr. at 268.) In March 2010, he returned to Dr. Go. (Tr. at 266-67, 277.) His physical examination results remained the same, but he now claimed he could not "do anything at home . . . ." (*Id.*) He was still seeing a chiropractor and also found that massage therapy eased the pain. (Tr. at 267.) The May 2010 notes mirror the previous findings, with Plaintiff adding that the chiropractor was "still

helping." (Tr. at 264.) Plaintiff had muscle spasms in his trapezii during the June 2010 visit, but the notes do not suggest any new results or concerns; he was the "same," he reported. (Tr. at 263.)

Most of the massage and chiropractor notes come from 2010. (Tr. at 284-91, 297-310.) The handful from 2008 and 2009 confirm his back and neck pain, but add little insight into his condition. (Tr. at 284.) At a February 2010 massage, his headache and neck pain were at ten out of ten on a VA scale, decreasing to level seven after the session. (Tr. at 297.) He became dizzy descending the therapist's table. (*Id.*) The remaining notes are largely unenlightening. (Tr. at 287-91, 297-310.) He admitted at times that the massage provided temporary relief. (Tr. at 298, 300.) In March, the therapist noted that the progress was slow, and indicated continuing restriction in his motion. (Tr. at 299.) His frustrations mounted in May, when he again said the massages gave temporary relief but no long-term progress. (Tr. at 288, 303.) The following month, however, the pain had lessened. (Tr. at 304-05.) In July, the pain began to radiate into his left arm, but only became intense when stressed. (Tr. at 306.)

In September, Plaintiff went to the hospital with chest discomfort. (Tr. at 352.) The symptoms were moderate, according to the notes. (*Id.*) At intake, he denied having received previous psychiatric treatment and admitted to smoking one and a half packs of cigarettes per day. (*Id.*) He denied back pain or any other issues except his chest problems. (Tr. at 352-53.) During the examination he appeared uncomfortable, but his neck's range of motion was normal, his breathing was clear, his extremities were normal with adequate range of motion, he walked normally, his memory was unproblematic, and his psychiatric state seemed normal. (Tr. at 353.) The nurse noted that he walked into the emergency room with a steady gait, was cooperative, denied neck or back pain, and was otherwise normal. (Tr. at 355.) Within a half hour, the pain had

14

begun to improve. (*Id.*) The doctor diagnosed an acute ST segment elevation myocardial infarction, ("STEMI"), or heart attack. (*Id.*) Dr. Go visited Plaintiff on his final day in the hospital, noting that Plaintiff had undergone an angioplasty and other procedures. (Tr. at 342, 363, 366-69.) Examinations during his stay generally produced normal results, though his heart appeared enlarged and small opacities dotted his lung base. (Tr. at 366-68, 372-73.) He was discharged after three days. (Tr. at 360.)

Dr. Mustafa Hashem, who treated Plaintiff in the hospital, (Tr. at 366-71), began consulting with him in October. (Tr. at 384.) At their first appointment, Plaintiff's neck was supple, his breathing clear, and he had normal sinus rhythm. (*Id.*) Plaintiff complained of dizziness, shortness of breath, and brief periods of chest pain which were dissimilar from the pain he felt before his heart attack. (*Id.*) Dr. Hashem thought the "atypical" chest pain was "likely muscular," and the dizziness and shortness of breath were likely caused by low-back pain. (*Id.*) Plaintiff would remain "off work for now." (*Id.*) At the next meeting, Plaintiff continued to have chest pain, but did not mention dizziness or shortness of breath. (Tr. at 382.) The examination results stayed the same, but a stress test was abnormal. (*Id.*) His hypertension was controlled, and he had hyperlipidemia and possible angina. (*Id.*) They planned a catheterization procedure. (Tr. at 383.)

Plaintiff returned to Dr. Hashem at the end of 2010, reporting that he was "doing ok." (Tr. at 380.) His examination results were again normal, his hypertension was controlled, he took medication for hyperlipidemia, and his ischemic cardiomyopathy was currently stable. (Tr. at 380-81.) Dr. Hashem also noted the coronary artery disease, treated during his hospitalization and with a repeat catheterization a "few months ago." (Tr. at 380.) The plan was to continue his medications and consult again in four months. (Tr. at 381.)

15

In February 2011, Plaintiff had a cervical MRI, which showed "[m]ild spondylotic changes" without significant stenosis or neural foraminal narrowing. (Tr. at 387.) His headaches continued, and he saw a chiropractor and massage therapist throughout the first half of 2011. (Tr. at 389-404, 413-24.) The pain hovered around levels seven and eight out of ten, Plaintiff reported. (*Id.*) The objective finding in all chiropractic sessions from February to May was "Hypomobility of C5–increased [range of motion]." (Tr. at 389-94, 413-22.) The misalignment at the C5 disc level was moderate, and Plaintiff made progress with the treatments. (*Id.*) Plaintiff also reported anxiety and sleeping difficulties. (Tr. at 399-400.)

Plaintiff saw Dr. Hashem again in May. (Tr. 409-10.) Despite fatigue, Plaintiff had "been doing relatively ok," he reported, and denied chest pain. (Tr. at 409.) The physical examination results were again normal; while an electrocardiogram ("EKG") report displayed a few mild or moderate abnormalities, it also showed improvements in left ventricle function. (Tr. at 408-09.) Dr. Hashem adjusted Plaintiff's medications and scheduled another visit in six months. (Tr. at 410.)

He also continued to treat with Dr. Go at the end of 2010 and the first half of 2011. (Tr. at 431-41.) Plaintiff still felt dizzy, experienced headaches, and had trouble sleeping. (Tr. at 440-41.) His physical examinations generally produced normal results. (Tr. at 434-39.) At most sessions, Plaintiff reported, "I'm the same," (Tr. at 435-36, 438-41), and rated his pain and dizziness at level seven or eight. (Tr. at 433.) Nonetheless, Dr. Go did not observe spinal tenderness in May–the other notes do not appear to mention it either, but the handwriting is difficult to decipher. (Tr. at 432.) He did notice muscle spasms. (Tr. at 433, 440-41.) In July, Dr. Go signed off on Plaintiff's plan to bowl with lightweight balls for exercise. (Tr. at 432.) The following month Plaintiff

16

reported he had been "tolerating" the bowling; Dr. Go now thought he could also "do minor chores around the house and garage." (Tr. at 431.)

### 2.    Application Materials and Administrative Hearing

In February 2010, Plaintiff filled out an insurance form describing the accident and his physical condition. (Tr. at 294.) He said his neck and head experienced moderate to intense pain and he was dizzy, forgetful, and irritated. (*Id.*) He had not experienced this pain or these symptoms prior to the accident. (Tr. at 296.) His treatment regimen included over twenty visits to three doctors. (Tr. at 296.)

In September 2010, Plaintiff completed a Function Report form. (Tr. at 192-99.) Plaintiff's wife filled out a similar report the same month, mirroring Plaintiff's assertions. (Tr. at 180-87.) His symptoms impeded working; particularly, the neck pain prevented him from looking up for longer than a few seconds; his "constant headache" worsened with noise; he grew confused and stressed during the day, forcing him to lie down four to five times; he was forgetful and irritable; and climbing stairs or ladders made him dizzy. (Tr. at 192.) On a typical day, he sat outside, watched television, lied down, showered, visited family, lied down again, watered plants, "putz[ed] around [the] house or garage," lied down a third time, worked on the computer, rested, ate dinner, watched television, and went to sleep. (Tr. at 193.)

Asked whether he took care of dependents, he said no; his wife looked after the family. (*Id.*) However, his wife said he occasionally let their dog out. (Tr. at 181.) He could not sleep through the night. (Tr. at 193.) Personal care presented no problems, but he needed reminders to take his medicine. (Tr. at 193-94.) His chores included watering plants and sweeping the garage. (Tr. at 194.) He avoided outdoor work due to his dizziness. (Tr. at 195.) He could drive and leave home

17

alone, but did not shop. (*Id.*) He avoided handling money because he grew confused and frustrated. (*Id.*) His social life was relatively active; he talked with friends in person or on the telephone and regularly visited his family. (Tr. at 196.) However, he sometimes became angry when dealing with others and he no longer frequented loud venues. (Tr. at 196-97.) As an example, his wife said he did not go to concerts. (Tr. at 185.) The symptoms affected numerous abilities, including, lifting, squatting, bending, reaching, kneeling, talking, climbing stairs, completing tasks, concentrating, understanding, following instructions, getting along with others, and his memory. (Tr. at 197.) He could walk one-hundred feet before resting and pay attention for "a few moments"; he struggled to follow written instructions and would not finish what he started. (*Id.*) Unusual behaviors had developed; particularly, dwindling self-confidence and excessive worrying. (Tr. at 198.)

Dr. Go filled out a preprinted RFC form in August 2011. (Tr. at 426-29.) Plaintiff had a traumatic brain injury and coronary artery disease; his prognosis was fair. (Tr. at 426.) Asked to "characterize the nature, location, frequency, precipitating factors, and severity" of Plaintiff's pain, he wrote, "HA [headache], neck pain." (*Id.*) He skipped the question asking him to identify clinical and objective findings supporting his conclusions. (*Id.*) The treatment and medications produced dizziness and fatigue. (*Id.*) Plaintiff's anxiety contributed to his limitations, wrote Dr. Go, declining to select other psychological conditions like depression and somatoform disorder. (Tr. at 427.) Plaintiff's pain was "[c]onstantly" severe enough to disrupt his attention and concentration. (*Id.*) Consequently, he was "[i]ncapable of even 'low stress' jobs." (*Id.*) The form's next section asked Dr. Go to estimate Plaintiff's capacities, such as his ability to stand and lifting limits. (Tr. at 427-29.) After concluding Plaintiff could not walk a full block, he left the rest of the questions blank, stating he was "unable" to complete them. (*Id.*)

Plaintiff attended the administrative hearing on September 12, 2011. (Tr. at 50.) Plaintiff's weight had fluctuated, the ALJ noted; Plaintiff explained that it varied after he quit smoking one year before. (Tr. at 51.) The disability developed after the accident, but he had stopped working earlier, when he was laid off. (Tr. at 53.) Plaintiff could handle his personal care. (Tr. at 54.) He did not use a computer, he testified, but conceded that he used it "a little bit." (Tr. at 54-55.) He said he could not type, nonetheless admitting he had an email account and sometimes sent text messages on his cell phone. (*Id.*) Since the accident he watched television "a lot." (*Id.*) The ALJ then asked if he watched any football games on the previous day; he recalled watching the "late game" but he could not remember which team won. (Tr. at 56, 59.) Plaintiff then confirmed his list of medications, forgetting the name of one used for anxiety. (Tr. at 60-61.) The ALJ asked him if he preferred watching television or bowling; "I bowl," he responded. (Tr. at 61.) He bowled in a league before his accident and still bowled independently with ten pound balls, as recently as the previous week; they were "very light," Plaintiff thought. (*Id.*)

Plaintiff's attorney then asked about his last job. (Tr. at 62.) Plaintiff said he had been called back to work after his accident and the job remained available if he recovered. (*Id.*) Asked what he struggled with after the accident, he could not think of specifics, noting only that his temper had increased. (Tr. at 63.) The attorney then brought in Plaintiff's wife to testify. (*Id.*) She had attended all of his doctor appointments, she stated, and had seen him struggle with memory and concentration. (Tr. at 64-65.) For example, because he frequently forgot to take his medicine, she set up a timer on his phone to buzz when he needed to take it. (*Id.*) He also misplaced his keys and money, forgot to complete tasks she requested in writing, and became lost driving. (Tr. at 65-66.) One time, he had a panic attack driving to his mother's and was taken to the hospital. (Tr. at 66-

19

67.) He went to the hospital with panic attacks on other occasions as well. (Tr. at 67.) He took two medications for anxiety, which first developed after his heart attack. (Tr. at 69, 75-76.) His heart problems had also persisted; he lost his breath simply walking to the mailbox in the summer heat. (Tr. at 68.) Dr. Hashem was considering a defibrillator if his condition did not improve. (*Id.*) The headaches and heart attack had sapped his energy, causing him to rest frequently for anywhere from thirty-minutes to a few hours. (Tr. at 68-69.) Dizziness occurred after even light exertions, such as ascending the stairs to their bedroom or using ladders to change lights in the basement. (Tr. at 71.) Another example occurred recently when he tried to pick up pots filled with tomatoes the family was canning. (Tr. at 75.) His chest hurt for the next two days, and the doctor thought he had a sore muscle. (*Id.*)

> The ALJ then asked the vocational expert ("VE") to assume
>
> a person of [Plaintiff's] age, education, and work experience who can perform at not more than the light exertional level with the following limitations. He can perform no more than occasional balancing, no constant rotation, or flexion, or extension of his neck. He should avoid concentrated exposure to environmental irritants, like dust, gases, fumes, odors, and . . . poorly ventilated areas. He should also have no more than frequent interaction with the public in his job.

(Tr. at 76-77.) Could that individual perform Plaintiff's past work as a painter? he asked. (Tr. at 77.) No, the VE responded, but there were other jobs the individual could perform: small products assembler (8000 positions in southeast Michigan); packer (6000 positions in southeast Michigan); and sorter (4000 positions in southeast Michigan). (*Id.*) The ALJ then added restrictions to the hypothetical: "[T]his person requires a sit stand option . . . and the option is at the employee's choice. Also, the person should avoid concentrated exposure to hazards like dangerous machinery and unprotected heights." (*Id.*) The same jobs remained available, the VE testified, but with only half the number of positions. (*Id.*)

20

The next hypothetical included the same restrictions, along with a limitation to sedentary work, to jobs "that do not require complex written or verbal communication," and to positions involving only one-, two-, and three-step tasks. (Tr. at 78.) The VE said that the individual could work as a packer (1500 positions), sorter (1500 positions), and bench assembler (3000 positions). (*Id.*) Finally, if that individual took two or more unscheduled, half-hour breaks a day, he could not maintain employment. (Tr. at 78-79.) Similarly, if the individual had "constant interference with attention and concentration" in even simple tasks, no jobs would be available. (Tr. at 79.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that Plaintiff had the RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a) except that he: requires a sit/stand option, at his choice; can only occasionally balance; should have no constant rotation, flexion or extension of the neck; should avoid concentrated exposure to environmental irritants (such as dusts, gases, fumes and odors) and to poorly-ventilated areas; must avoid concentrated exposure to hazards like dangerous machinery and unprotected heights; is limited to occupations that do not require complex written or verbal communication; is limited to jobs consisting of 1-,2-, or 3-step tasks; and should have no more than occasional interaction with co-workers and the public.

(Tr. at 37.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). After review of the record, I suggest that the ALJ utilized the proper legal standard in the five-step disability analysis of Plaintiff's claim. I next consider whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff makes two arguments, though they are essentially the same. First, he claims that the ALJ's RFC is inaccurate. (Doc. 15 at 4-8.) Plaintiff's discussion is mostly descriptive rather than analytical, copying portions of his factual statement from above and adding conclusory statements throughout. (*Id.*) These facts are never analytically connected to discrete errors in the RFC. For example, he discusses imaging studies of his cervical discs, but fails to show how they support a more restrictive RFC. The brief essentially condenses the medical record.

To a lesser degree, the same problem plagues his second argument, focusing on the ALJ's treating source analysis. (*Id.* at 8-12.) He begins with an extensive discussion of treating source law, which requires ALJs to give significant deference to treating sources or explain why they did not. (*Id.* at 8-10.) He then repeats the facts surrounding Dr. Go's examinations and opinion statement. (*Id.* at 10.) The analysis comes in a short statement tucked in the middle of the section: "Dr. Go's findings are consistent with the medical evidence of record and, especially because it is the only opinion of record in this case and therefore uncontradicted, this opinion should have been given great weight by the ALJ." (*Id.*) He then repeats many of the facts he described above, often verbatim. (*Id.* at 10-12.) Concluding, he reiterates Dr. Go's status as the only medical source to issue an opinion. (*Id.* at 12.)

22

b.      **Medical Source Evidence, Plaintiff's Credibility, and the RFC**

i.      **Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The regulations do not prescribe any similar test for opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an

24

impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[2] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

When objective evidence does not support the opinion, the regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *4 (1996) . *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007); *Revels v. Sec. of Health &*

---

[2] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

*Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930,

at *1 (6th Cir. 1995) (unpublished table decision).. Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. *See also Rogers*, 486 F.3d at 242. "This requirement is not

simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A]

failure to follow the procedural requirement of identifying the reasons for discounting the opinions

and for explaining precisely how those reasons affected the weight accorded the opinions denotes

a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon

the record." *Rogers*, 486 F.3d at 243.

Also, when objective evidence is lacking, an ALJ must analyze the credibility of the

claimant, considering the claimant's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility

determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No.

09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377,

379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's

testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective

symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ

evaluates complaints of disabling pain by confirming that objective medical evidence of the

26

underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

27

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to

the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

## ii.    Analysis

Plaintiff's contentions fail to persuade. Taking the core argument first, I suggest the ALJ's treating source analysis was adequate. ALJs can decline to give controlling weight to an opinion that is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Once rejected, ALJs must proffer "good reasons" based on regulatory factors–such as length of the treatment relationship and the opinion's supportability–for the weight they accord the opinion. *Id.* § 404.1527(c). Here, the ALJ examined Dr. Go's treatment history with Plaintiff, his clinical findings, and the contested opinion statement. (Tr. at 38-41.) The ALJ gave the opinion limited weight because it lacked specificity and objective support. (Tr. at 41.) Elsewhere, he provided additional rationale for rejecting Plaintiff's application, implicating the treating source analysis: Plaintiff's reluctance to take pain medications, failure to seek mental health treatment, and the medical recommendations that he increase his activity level. (Tr. at 35-36, 41.)

These constitute "good reasons" for the ALJ's findings. Dr. Go's sparse opinion statement fails to include much useful information concerning Plaintiff's capacities. A more detailed opinion

describing specific limitations could have set the contours of the ALJ's RFC. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014). Without these concrete restrictions, the opinion begins to resemble a simple conclusion that the Plaintiff is disabled, which is owed no deference because it implicates vocational considerations outside the source's expertise. 20 C.F.R. § 404.1527(d). The RFC instead is "the most [the claimant] can still do despite [her] limitations." *Id.* § 404.1545(a)(1). Thus, by definition, a treating source opinion can bind the ALJ's RFC decision only by including well-supported examples, activities, or capacities that show what the claimant "can still do."

Dr. Go's statement does not establish Plaintiff's specific limitations. (Tr. at 426-29.) The problems begin at the outset, where Dr. Go gave underwhelming responses to questions specifically linked to the regulations. The Commissioner uses treating source opinions "to provide evidence . . . on the nature and severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1527(d)(2). Dr. Go's form referred to this regulation, asking him to "characterize the nature, location, frequency, precipitating factors, and severity of [his] patient's pain." (Tr. at 426.) He hardly could have written a tome in the two lines provided for the answer, but his response was particularly cursory and unenlightening: "HA [i.e., headache], neck pain." (*Id.*) Prompted to explain other conclusions, he often declined, leaving spaces blank. For example, he ignored the space provided for him to discuss his opinion that Plaintiff could not perform "even 'low stress' jobs." (Tr. at 427.) Most detrimental to the opinion's cogency, however, was his decision to skip the form's second half, citing his inability to opine on the matters it presented. (Tr. at 427-29.) This portion of the form inquired about specific limitations–among others, how long could Plaintiff sit? how long could he stand? how much could he lift? could he often look up, down, or turn his head?

(*Id.*) By skipping these critical questions, Dr. Go produced an unadorned and enervated opinion. The ALJ properly rejected it on this basis.

Moreover, the treatment notes and other record evidence do not clearly support Dr. Go's ultimate conclusion. As the ALJ noted, Plaintiff told Dr. Go in March 2009, the month of the accident, that he did not take any medications. (Tr. at 38, 278.) This provides some evidence that Plaintiff was overemphasizing his complaints. Dr. Go's form indicated that medications made Plaintiff dizzy, perhaps giving an acceptable reason for Plaintiff's failure to seek medication. (Tr. at 426.) But this assertion is not well-supported. Plaintiff suggested that the head injury, not medication, caused the dizziness; and he complained of it even before taking medication. (Tr. at 237, 240, 297, 324.) Dr. Hashem thought that at least one bout of dizziness resulted from back pain. (Tr. at 384.) Additionally, at the genesis of his problems–the accident–Plaintiff appears to have been somewhat nonchalant about his plight, saying he went to the hospital only because an actress had recently died from a head injury, and insinuating he did not like medications. (Tr. at 236, 278.) Of course, he did go to the hospital and offered other, more compelling reasons, why; but his seeming lack of urgency or concern slightly undercuts his complaints.

More importantly, examinations with Dr. Go and others consistently produced normal results. (Tr. at 225-27, 266-67, 273-75, 277, 279-80, 353, 380-81, 384, 408-09, 432, 434-39.) Imaging and other mechanized test results were also normal, or at least not disconcerting. (Tr. at 231-32, 387, 408-09.) Only a few mentions of neck stiffness, moderate cervical disc misalignment, and spinal tenderness appear in the record, (Tr. at 249-50, 389-94, 413-22), generally preceding notes that he had since improved or that new treatments, such as massage and chiropractic, helped. (Tr. at 252-53, 260, 264, 267, 298, 300, 304-05, 432.) Also, Plaintiff could do light housework,

31

drive, and had at least made attempts to haul tomato buckets during canning sessions and use ladders when changing light bulbs. (Tr. at 71, 75.) He enjoyed social activities despite his irritability. (Tr. at 196, 237-38.) Dr. Go agreed that he could bowl, with a lightweight ball, for exercise; and Plaintiff did so without incident. (Tr. at 61, 237, 431-32.) Finally, according to the lone mental health opinion in the record, Plaintiff's cognitive deficits were best addressed by increasing his activity level and would not prevent him from returning to prior work. (Tr. at 245-46.)

For the same reasons, substantial evidence supports the RFC. As noted, Plaintiff does not point out any specific defects. The ALJ incorporated most of Plaintiff's complaints despite their questionable bases. He restricted his balancing to account for his dizziness and his neck movements to account for his spinal pain. (Tr. at 37.) Without any indication Plaintiff ever sought mental health treatment, the ALJ credited his complaints enough to limit him to one- to three-step task jobs with only occasional interaction with others. (*Id.*) In fact, the physical therapist confirmed he could consistently follow two-step instructions. (Tr. at 251.) This RFC restriction also adequately reflected Dr. Gelb's findings. (Tr. at 235-46.) Nothing in the record plausibly explains how his accident, or any other condition, had resulted in disabling restrictions. Plaintiff recites the evidence without building any logical bridge between it and his desired outcome. (Doc. 15.) In short, the record does not demonstrate more severe limitations. Therefore, I suggest the ALJ's findings have substantial support.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice'

within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.

If the Court determines that any objections are without merit, it may rule without awaiting the

response.

Date:  February 9, 2015                    /S PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge